# UNITED STATES DISTRICT COURT
for the

District of Minnesota

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 16-MJ-584 HB |
| MOHAMED AMIIN ALI ROBLE | |

## CRIMINAL COMPLAINT

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

COUNT I: On or about August 29, 2014, in Hennepin County, in the State and District of Minnesota, defendant conspired to provide material support, specifically personnel and resources, to the Islamic State of Iraq and the Levant (hereinafter "ISIL"), a designated foreign terrorist organization; and

COUNT II: On or about December 27, 2014, outside any judicial district, defendant provided material support and resources, specifically personnel and resources, to ISIL, a designated foreign terrorist organization.

All in violation of Title 18, United States Code, Section(s) 2339B(a)(1).

I further state that I am a(n) Special Agent and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:   ☒Yes   ☐ No

_____
*Complainant's Signature*

Daniel Higgins, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/24/16

_____
*Judge's Signature*

City and State: St. Paul, MN

Hildy Bowbeer, U.S. Magistrate Judge
*Printed Name and Title*

SCANNED
AUG 24 2016
U.S. DISTRICT COURT ST. PAUL

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
District Court File No. 16-MJ-584 HB

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | **AFFIDAVIT OF FBI SPECIAL** |
| Plaintiff, ) | **AGENT DANIEL HIGGINS** |
| ) | **IN SUPPORT OF AN** |
| v. ) | **APPLICATION FOR A** |
| ) | **CRIMINAL COMPLAINT** |
| MOHAMED AMIIN ALI ROBLE, ) | **AND AN ARREST WARRANT** |
| ) | |
| Defendant. ) | |

| | |
|---|---|
| STATE OF MINNESOTA ) | |
| ) SS: | |
| COUNTY OF RAMSEY ) | |

I, Daniel P. Higgins, being duly sworn upon my oath, depose and state as follows:

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI"). I have been employed by the FBI since October of 2010. Since March of 2011 I have been assigned to the Joint Terrorism Task Force (the "JTTF") of the FBI's Minneapolis Division. In this capacity I investigate, among other things, criminal cases relating to international terrorism, such as allegations of the provision of material support to designated foreign terrorist organizations. In addition to my on-the-job experience, the FBI has provided me with extensive training in international terrorism and the techniques used to investigate allegations of international terrorism. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended only to show that there is probable

1

cause for the requested complaint and does not set forth all of my knowledge about this matter.

2. This affidavit is intended to show only that there is probable cause for this Court to issue the requested criminal complaint and arrest warrant. This affidavit does not set forth all of my knowledge about this matter.

3. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the defendant herein, **MOHAMED AMIIN ALI ROBLE** (hereinafter "**ROBLE**"), has violated 18 U.S.C. § 2339B(a)(1) by providing, and conspiring to provide, material support, specifically personnel and resources, to the Islamic State of Iraq and the Levant (hereinafter "ISIL"), a designated foreign terrorist organization, as described in more detail below.

## FACTS CONSTITUTING PROBABLE CAUSE

*The Islamic State of Iraq and the Levant is a Designated Foreign Terrorist Organization*

4. ISIL is a designated Foreign Terrorist Organization. On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.

5. On May 15, 2014, the Secretary of State amended the designation of al-Qa'ida in Iraq as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under Section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL")

2

as its primary name. The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham, the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa ash-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. Although the group has never called itself "al-Qa'ida in Iraq," this name has frequently been used to describe it throughout its history. In an audio recording publicly released on June 29, 2014, ISIL announced a formal change of ISIL's name to the Islamic State.

*Criminal Charges Related to a Minnesota-Based Conspiracy to Provide Material Support to ISIL*

6. Beginning no later than approximately March of 2014, several young men from Minnesota's Somali-American community began conspiring to travel to Syria to join, and fight for, ISIL. Ten of these men, not including **ROBLE**, have so far been charged, by Complaint, Information, or Indictment, as a result of the FBI's investigation into this conspiracy. Nine of the ten men have been convicted. Two of the ten, Abdullahi Yusuf ("Yusuf") and Abdirizak Warsame ("Warsame") pled guilty to an Information charging them with providing, and conspiring to provide, material support to a designated foreign terrorist organization (ISIL), in violation of 18 U.S.C. § 2339B(a)(1). Three more of the ten, Zachariah Abdurahman ("Abdurahman"), Hanad Musse ("Musse"), and Adnan Abdihamid Farah ("A. Farah"), pled guilty to one count of a Superseding Indictment charging them with conspiring to provide material support to a designated foreign terrorist organization (ISIL), also in violation of 18 U.S.C. § 2339B(a)(1). One of the ten, Hamza Naj Ahmed ("Ahmed"), pled guilty to two counts in a Second Superseding Indictment,

3

charging him with conspiring to provide material support to a designated foreign terrorist organization (ISIL), in violation of 18 U.S.C. § 2339B(a)(1), and financial aid fraud, in violation of Title 20 U.S.C. § 1097(a).  On June 3, 2016, three men, Abdirahman Daud ("Daud"), Guled Ali Omar ("Omar"), and Mohamed Abdihamid Farah ("M. Farah") were convicted after jury trial of conspiracy to murder overseas, in violation of 18 U.S.C. § 956, and of conspiring to provide material support to a designated foreign terrorist organization (ISIL), in violation of 18 U.S.C. § 2339B(a)(1), among other offenses.  The last defendant of the ten, Abdi Nur ("Nur") is believed to have reached Syria, where he joined, and fought for, ISIL.  Nur has been charged by criminal complaint with conspiring to provide, and providing, material support to a designated foreign terrorist organization (ISIL), in violation of 18 U.S.C. § 2339B(a)(1).

*The Conspiracy of Which **ROBLE** is a Part*

7.     Defendant **ROBLE** is a United States citizen who was born on August 19, 1996.  He used to live in south Minneapolis, but is now believed to be living in Syria.  He is the nephew of Nur, who, as indicated in paragraph six of this affidavit, has been charged by Complaint with federal crimes related to his provision of material support and resources to ISIL.

8.     On May 28, 2014, Yusuf was dropped off at school as usual by his father.  Unknown to his father, or to anyone besides his co-conspirators, Yusuf for some time had been meeting with other young men who were all planning to leave Minnesota and join ISIL in Syria.  About one hour after being dropped off at school on May 28, 2014, Yusuf

left school and was later picked up by **ROBLE**'s uncle, Nur, who was driving a blue Volkswagen Jetta, with a Minnesota license plate number that is known to your affiant.

9. The blue Jetta, with Nur and Yusuf in it, eventually arrived at the Blue Line light rail station near 50th Street and Hiawatha Avenue in Minneapolis, where Yusuf caught a train to Minneapolis – Saint Paul International Airport (hereinafter "MSP"). At MSP, Yusuf intended to catch a flight to New York's John F. Kennedy International Airport (hereinafter "JFK"), then transfer to a flight to Moscow, Russia. In Moscow, Yusuf would transfer to a flight to Istanbul, Turkey. From Istanbul, Yusuf later admitted to the FBI in interviews, Yusuf intended to make his way across the Turkish-Syrian border into Syria, where he would join ISIL. However, when Yusuf arrived at MSP, federal law enforcement agents prevented him from traveling.

10. The following day, May 29, 2014, Nur succeeded in departing MSP. After intermediate stops in Newark, New Jersey and Munich, Germany, Nur arrived in Istanbul on May 30, 2014. He then crossed into Syria, where he joined ISIL.

11. Nur was extremely active on social media, such as Facebook and Twitter, during his time in Syria. Most of his social media postings praised ISIL and the use of violence against those who do not share Nur's (and ISIL's) extreme view of the requirements of Islamic law for one's lifestyle. Nur's social media postings also exhort others to travel to Syria to join, and fight for, ISIL. Nur was in individual contact with several young men from Minnesota who were considering whether to join ISIL. In many cases, Nur recommended that the young men join ISIL or provided practical advice about how to reach Syria, or both.

*Sources of Funds Which Defendant **ROBLE** Spent on Travel to Syria to Join, and Fight For, ISIL*

12. On August 1, 2007, the bridge carrying Interstate 35W over the Mississippi River just north of downtown Minneapolis collapsed, killing 13 people and injuring 145. Defendant **ROBLE** suffered personal injuries in the bridge collapse. His parents filed suit against the State of Minnesota and also against an engineering firm and contractor (the suit was brought by defendant **ROBLE**'s parents because defendant **ROBLE** was under 18 at the time the lawsuit was filed). Defendant **ROBLE** recovered against all three defendants. Because **ROBLE** was under 18, the lawsuit settlement proceeds were used to purchase structured settlement annuities from a major insurance company, the identity of which is known to your affiant. The initial principal, plus accumulated interest, was paid to **ROBLE** on his eighteenth birthday, August 19, 2014. At that time, **ROBLE** received $65,431.22 from the State of Minnesota's structured settlement annuity, $11,167.00 from a contractor who worked on the collapsed bridge and $15,056.00 from a consulting engineering firm that had performed work on the collapsed bridge. The total value of the three structured settlements on defendant **ROBLE**'s eighteenth birthday was approximately $91,654.22.

*In August and September 2014 Defendant **ROBLE** Prepares for Overseas Travel*

13. On August 29, 2014, defendant **ROBLE** opened two accounts at a major bank. One of these accounts was a checking account and the other was a savings account. On or about September 5, 2014, a check for the amount of the contractor structured settlement annuity, $11,167.00, drawn to the order of "**MOHAMED ROBLE**" was deposited into **ROBLE**'s checking account. Beginning the day after this check was

6

deposited, September 6, 2014, and continuing until September 11, 2014, **ROBLE** withdrew approximately $3,164.00 from this checking account in cash, as a combination of two in-person cash withdrawals at bank branches, and five ATM cash withdrawals.

14.     On or about October 3, 2014, defendant **ROBLE** deposited the second structured settlement check, this one from the engineering firm, in the amount of $15,056.00, into his checking account. Over the next two days, this deposit, plus the balance remaining from the first check, was used to fund three checks: two checks in the amounts of $4,000.00 and $5,000.00, totaling $9,000.00, drawn to the order of Ali Roble Farah, the father of defendant **ROBLE**; and one check in the amount of $5,000 drawn to the order of a restaurant in Minneapolis. According to records obtained from the Minnesota Secretary of State, defendant **ROBLE**'s mother is a registered agent for this restaurant business.

### Co-Conspirator A. Farah Applies for a United States Passport

15.     Co-conspirator Yusuf,[1] who is now cooperating with the government's investigation and prosecution of this case, has stated that he was meant to join Nur in Turkey. In addition, on or about April 25, 2014, co-conspirator A. Farah applied for a United States passport. On his passport application, A. Farah stated that he needed a passport for an upcoming trip to China. A. Farah obtained his passport; however, his

---

[1] On or about February 26, 2015, defendant Yusuf pleaded guilty to a violation of 18 U.S.C. § 2339B, conspiracy to provide material support to designated foreign terrorist organization (ISIL). Yusuf is hoping his cooperation will result in a reduced sentence. During the course of the investigation Yusuf made several material statements to the FBI that he later acknowledged were false.

7

parents discovered the passport and confiscated it when it was delivered to the family home. As a result, A. Farah was unable to put into action any plans that he may have had for overseas travel in the Spring of 2014. When the FBI later made inquiries of the Farah family about this purported trip to China, A. Farah's father stated that the family had talked, but only in general terms, about someday going on a trip to China and seeing the Great Wall.

<em>Defendant <strong>ROBLE</strong> Applies for a United States Passport</em>

16.  On or about August 25, 2014, defendant **ROBLE** applied for a United States passport. **ROBLE** told the passport specialist that his plans were to travel to China on August 27, 2014, and return to the United States one month later, on September 27, 2014. **ROBLE** also told the passport specialist that he planned to study in China. When the passport specialist asked whether **ROBLE** had a visa for China, **ROBLE** responded that he had not been aware of the need for a visa. When asked at which educational institution in China he was going to study, **ROBLE** mumbled indistinctly in response, and could not be understood by the passport specialist. The following day, August 26, 2014, **ROBLE** returned with his father, who informed the passport specialist that he, the father, was going to travel to China with **ROBLE**. However, because **ROBLE**'s father did not have a current passport himself, this was not possible. **ROBLE** was issued U.S. passport card number XXXXX9966 on August 26, 2014, and U.S. passport book number XXXXX7430 on

August 27, 2014.[2] The full numbers of both the passport card and the passport book are known to your affiant.

### *ROBLE departs the United States for China*

17. On October 4, 2014, defendant **ROBLE**, accompanied by his mother, Ubah Nur, left Minneapolis and flew to China via San Francisco. From Beijing, People's Republic of China, defendant **ROBLE** traveled onwards by air to the city of Wuhan, in Hubei Province.

### *From Minneapolis, Co-Conspirators Attempt to Travel to Syria via San Diego and New York City*

18. On November 5 and 6, 2014 co-conspirators M. Farah, Musse, Abdurahman, and Ahmed purchased Greyhound bus tickets for travel from Minneapolis to New York City.

19. On November 6, 7, and 8, co-conspirators M. Farah, Musse, Ahmed, and Abdurahman attempted to travel to Syria by taking Greyhound buses from Minneapolis to New York City. In New York, the four went online and purchased airline tickets to various destinations in southeastern Europe that were close to Turkey, or involved a change of planes in Turkey. M. Farah and Ahmed were booked on the same flight to Istanbul, Turkey. From Istanbul, their scheduled itineraries diverged: M. Farah was ticketed to Sofia, Bulgaria, while Ahmed was ticketed to Madrid, Spain, but with a change of planes in Istanbul, Turkey. Abdurahman and Musse were booked on the same flight from JFK with

---

[2] A passport card can be used for travel to Canada and Mexico. It is less bulky than a passport book, and can be carried in a wallet in the same way as a driver license or credit card.

9

a final destination of Athens, Greece. All four men were prevented from traveling by federal law enforcement agents at JFK.

20. After the four men named in the preceding paragraph of this affidavit had purchased their Greyhound tickets, but before they had actually left Minneapolis, co-conspirator Omar attempted to fly from MSP to San Diego, California. Having been notified of Omar's ticket purchase, however, federal law enforcement agents met Omar at MSP. Agents learned that Omar had checked no luggage but was carrying his passport. Omar was not allowed to board his flight to San Diego.

*Defendant **ROBLE** Makes Two Trips to Turkey from China*

21. Between on or about November 6-10, 2014, as his co-conspirators were making their way to JFK from Minneapolis, defendant **ROBLE** made six withdrawals, totaling a little less than $1,000 in cash, at an ATM of the Agricultural Bank of China in Wuhan, Hubei Province, People's Republic of China. The withdrawals were from the checking account that defendant **ROBLE** had opened on August 29, 2014.

22. On November 17, 2014, defendant **ROBLE** flew to Istanbul, Turkey. According to **ROBLE**'s mother, **ROBLE** telephoned his mother in Minneapolis from Istanbul, told her he was in Turkey "shopping," and told her he needed an airline ticket back to China. **ROBLE**'s mother went to the same travel agency from which **ROBLE**'s October 4, 2014 travel to China had been bought, and purchased air transportation for **ROBLE**. His itinerary shows **ROBLE** departing Istanbul for Beijing on Turkish Airlines on November 17, 2014, then continuing on to Wuhan. **ROBLE** returned to Wuhan from Istanbul the same day he arrived in Istanbul from Wuhan.

23. On December 27, 2014, **ROBLE** again traveled to Istanbul. As of the date of this complaint affidavit, he has not returned from this second trip from China to Turkey.

*Defendant **ROBLE** is in Syria, Fighting for ISIL*

24. As described further below, statements from cooperating defendants and other witnesses, statements uttered by co-conspirators on tape recordings that were surreptitiously made as part of the FBI's investigation of this conspiracy, internet and social media evidence, and financial evidence all indicate that **ROBLE** is now in Syria, where he is fighting for the designated foreign terrorist organization, ISIL.

*Statements Given to Law Enforcement by a Cooperating Defendant about **ROBLE***

25. On Wednesday, January 27, 2016, and again on Tuesday, February 2, 2016, co-conspirator Abdirizak Warsame ("Warsame") was interviewed pursuant to the terms of a proffer agreement.[3]

26. During these interviews, Warsame stated that he had seen, on social media sites, photographs of defendant **ROBLE** in a desert setting. In some photographs, defendant **ROBLE** is carrying a black ISIL flag; in others, he is carrying what appears to be an assault rifle. Warsame described one photograph as being of **ROBLE** and Nur together in Syria, but did not know the date on which these photographs were taken.

27. Warsame also recalled speaking with **ROBLE** the week after Nur left Minnesota for Syria (Nur departed Minnesota on May 29, 2014). During this conversation,

---

[3] On or about February 11, 2016, Warsame pleaded guilty to an Information charging him with providing, and conspiring to provide, material support to a designated foreign terrorist organization (ISIL), in violation of 18 U.S.C. § 2339B(a)(1). Warsame is hoping that his cooperation will lead to a reduced sentence.

11

**ROBLE** stated that Nur was in a "better place" and indicated to Warsame that he [**ROBLE**] was trying to go to Syria as well.

*Statements Given to Law Enforcement by a CHS about **ROBLE***

28. One of the participants in the conspiratorial discussions involving travel to Syria was a Confidential Human Source (hereinafter "CHS") for the FBI. This CHS (1) provided statements to the FBI describing his recollections of both statements and actions taken by members of the conspiracy, including **ROBLE**; and (2) at the direction of the FBI, wore a hidden recording device during his/her interactions with the members of the conspiracy and was able to capture many hours of conversation relevant to the investigation into terrorism offenses. In several of those recorded conversations, members of the conspiracy speak of defendant **ROBLE** being in Syria, fighting for ISIL.

29. The CHS recalled a meeting in 2014 at a Minneapolis-area mosque at which a group of aspiring travelers, including the CHS, discussed travel to Syria. The CHS was aware from others that **ROBLE** would have access to money to accomplish his travel to Syria once he turned 18 and his parents released the money to him. The CHS recalled **ROBLE** was "quiet" during the meeting and listened to everyone else's plans. **ROBLE** then noted that he intended to travel to Turkey after first traveling to China.

30. The CHS also recalled that in late October/early November 2014, he contacted **ROBLE** – then in China – and asked **ROBLE** for travel money so he could get to Syria. **ROBLE** advised the CHS to get a bank loan and sent to the CHS an internet link

with instructions on how to obtain a bank loan. During this conversation the CHS advised **ROBLE** that others from Minnesota had plans to travel to Syria soon.[4]

*The CHS Records Co-Conspirators Speaking of **ROBLE** Being in Syria*

31. As indicated above, the CHS recorded discussions between the conspirators about **ROBLE**. For example, on March 3, 2015, co-conspirator Omar (who had been, for a time, leader or "emir" of the group hoping to travel to Syria) informed co-conspirator Hanad Musse and the CHS of **ROBLE**'s financial generosity to his fellow ISIL members in Syria:

*Guled Omar: Guess how much money he [Note: "he" is defendant **ROBLE**] took with him.*

*CHS: Huh?*

*Guled Omar: 20G's*

*CHS: Huh.*

*Guled Omar: [unintelligible] After, he bought all the brothers over there a new car.*

*CHS: That is [unintelligible]*

*Guled Omar: [unintelligible] he Abdi car he bought [unintelligible] Abu Khattab a car. He paid for two of his marriages.*

---

[4] The events described in paragraphs 29 and 30 occurred before the CHS began cooperating with the FBI's investigation. The statements described in paragraphs 29 and 30 were not tape-recorded. Before cooperating with the FBI, the CHS testified twice before a federal grand jury. During this testimony, the CHS provided answers to the grand jury that he knew were not truthful. Further, after the CHS agreed to cooperate, the CHS initially provided a description of events that falsely minimized the CHS's own role in the offense. The CHS has not been charged with any offenses for the aforementioned conduct.

*CHS: Who?*

*Guled Omar: Rose. [Note: "Rose" is a nickname for defendant **ROBLE**.]*

*CHS: Whose two marriages?*

*Guled Omar: Abu Khattab has two wives now. He paid for both of them.*

*Guled Omar: The guy just bottomed out. Passing out money like it's candy.*

32. Later, on March 15, 2015, co-conspirator Abdurahman spoke with the CHS about defendant **ROBLE**, using **ROBLE**'s nickname "Rose". Discussing the marriage of Abdi Nur (**ROBLE**'s uncle), co-conspirator Abdurahman stated that the marriage would mean a change in **ROBLE**'s living arrangements: "He's finally going to be all by himself now cause Curry's [Note: "Curry" is a nickname for Abdi Nur] going to have his own house."

33. On April 3, 2015, co-conspirator Daud told the CHS and M. Farah that "Rose called me." As noted above, "Rose" is a nickname for defendant **ROBLE**. Daud told the CHS and M. Farah that "Rose" was in "Dar al-Islam" or "the Land of Islam," and also told the CHS and M. Farah that "Rose" had said that Nur and a Somali fighter named Khattab had moved in together. Daud told the CHS and M. Farah that "Rose" had told him he was going to work, and Daud offered the opinion that "Rose's" work would be "ribat" or patrolling.

34. On April 6, 2015, co-defendant Musse told the CHS that he was going to allay suspicion before traveling the same way that "Rose" had done it, by engaging in un-Islamic behavior such as smoking cigarettes. Musse stated that he was "gonna go to the extent Rose did."

14

*Use of Defendant **ROBLE**'s ATM card in Gaziantep, in southern Turkey, is Further Evidence that Defendant **ROBLE** is in Syria.*

35. On August 19, 2014, the structured settlement monies from the I-35W bridge collapse were released to **ROBLE**. More specifically, the insurance company from which the structured settlement annuity had been purchased issued a check in the amount of $65,431.22, drawn to the order of **ROBLE**. On December 10, 2014, while **ROBLE** was in China, this check was deposited to **ROBLE**'s checking account.at a bank branch in Minneapolis

36. During his stay in China and prior to departing on December 27, 2014, **ROBLE** withdrew approximately $1,688.01 in cash from his checking account in 9 separate transactions. Following his December 27, 2014 trip to Istanbul, Turkey, the ATM card associated with **ROBLE**'s checking account was used approximately 45 times to withdraw cash from ATMs. The first withdrawal was on December 28, 2014, and the last on May 11, 2015. These ATM withdrawals totaled approximately $47,071.62.

37. These withdrawals all took place in and around Gaziantep, a city in southern Turkey. Gaziantep is approximately 35 miles from the Turkey-Syria border crossing at the Turkish town of Kilis. In turn, Kilis is only a further 40 miles from the Syrian city of Aleppo, which at that time (and since) was the scene of significant ISIL activity. From my experience, I have learned that young men seeking to join ISIL frequently cross from Turkey into Syria at the Kilis border crossing. I am also aware of published reports that have described the increase in jihadist-oriented travelers passing through Gaziantep.

38. Between, on or about December 28-30, 2014, **ROBLE**'s debit card was used approximately 12 times to make retail purchases in Gaziantep. All the purchases appear to be for clothing, sporting goods, and electronics. This is consistent with **ROBLE** purchasing equipment in Gaziantep before crossing into Syria at Kilis. Between December 28, 2014 and March 6, 2015, approximately $47,071.62 was withdrawn from ATMs in and around Gaziantep. This large sum is consistent with previously-mentioned CHS reports that **ROBLE** was financially supporting himself and other members of ISIL, including by purchasing vehicles to be used by members of ISIL.

*Internet Activity from the Same Internet Protocol Address Indicated that **ROBLE** and Nur Were in the Same Place.*

39. Nur was last known to live in Syria, belonging to and fighting on behalf of ISIL. On May 18, 2015, defendant **ROBLE's** Apple iTunes Music Store account was logged into from IP address 185.XX.XX.XXX. The full IP address is known to your affiant. Just four minutes later, Nur's Facebook account recorded a log-on from the same IP address. An IP address, or "internet protocol address" is a unique number assigned to a connected device in an IP network. Every desktop and laptop computer, server, scanner, printer, modem, router, smartphone, and tablet is assigned an IP address, and every IP packet traversing an IP network contains a source IP address and a destination IP address. IP addresses are written as a series of four numbers, ranging from zero to 255, separated by decimal points. The facts that defendant **ROBLE**'s iTunes account was accessed from IP address 185.XX.XX.XXX, and that four minutes later Nur's Facebook account was

accessed from the same IP address, support a strong inference that Nur and **ROBLE** were co-located on May 18, 2015.

40. On August 25, 2015, **ROBLE**'s iCloud account was again logged into from IP address 185.XX.XX.XXX. One hour and seventeen minutes later, Nur's Facebook account was logged on to from the same IP address. These facts support an inference that Nur and defendant **ROBLE** were co-located on August 25, 2015.

## CONCLUSION

41. Based on all of the foregoing, your affiant respectfully submits that there is probable cause to believe that defendant **MOHAMED AMIIN ALI ROBLE** has joined the designated foreign terrorist organization ISIL and has provided, and conspired to provide, material support and resources, including personnel and resources, to ISIL. Wherefore your affiant respectfully asks that this Court issue the requested criminal complaint and also issue a warrant for the arrest of defendant **ROBLE**.

Dated: August 24th, 2016

Respectfully Submitted,

_____
Daniel P. Higgins, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this
24th day of August, 2016

_____
THE HONORABLE HILDY BOWBEER
UNITED STATES MAGISTRATE JUDGE